I think the clerk already indicated this but because there's three appeals here the way we're going to split the time in order to make it both easier in terms of timekeeping and also in terms of the cases is we'll hear argument first on the appeals related to the jurisdiction and the 60B and those are the cases in which Safe Cig is the appellant. We'll hear that for 15 minutes per side and then when that's when we're finished with jurisdiction we'll go to the third appeal which relates to whether if there is an appropriate judgment the district court calculated the commissions correctly in terms of the time frame and that'll be five minutes per side and at that point the new gen would be the appellant. Perhaps I can ask a clarifying question. Sure. Our initial appeal from the judgment raised in addition to the jurisdictional problem an abuse of discretion with respect to applying the ITEL fact. Yes and that's all part of that judgment and the initial judgment. So I should argue that in the initial 15 minutes. Everything related to the jurisdiction, the entry of the judgment, the basis for the entry of the default judgment. Let's put all that together because it's all related. Excellent. So that goes in the first 15 minute charge. Very good. Thank you. Good morning, your honors. May it please the court. Ricardo Sestero on behalf of the Safe Cig LLC, defendant, appellant, and appellee on the cross appeal. This appeal arises out of the district courts failure to adhere to the fundamental policy disfavoring default judgments and favoring resolution of merits. As the Mesley court and other cases that we've cited make clear, this policy requires that default judgments only be permitted in extraordinary circumstances and failing to consider this policy is reversible error on a default on an appeal from a default judgment. Here the district court ignored this principle really at every stage of the proceedings. It ignored this initially entered judgment. So are you mainly saying that it was an abuse of discretion under the in applying the ITEL factors? Is that what your focus is on? No, your honor. But the jurisdictional question, in considering the jurisdictional question, the district court also failed to consider and appreciate the fundamental policy in favor of resolution of cases on the merits. So on the jurisdictional question, you're saying that the the allocations of diversity jurisdiction were deficient in the original complaint. That's something that I guess your client didn't catch until after a notice of appeal had already been filed up here. And then having caught it, we sent it back to the district court and the district court allowed Nugent to amend the complaint to to make appropriate allegations of diversity. So so at that I guess your client argued that something more was needed. So are you focusing on that, on that, whether the district court erred in in allowing the Nugent to to amend its complaint? Do you want to focus on that? Yes. Yes, your honor. Although I don't think you even need to get to that point because I think the district court's failure in the very first instance to establish whether it had jurisdiction is a sufficient basis in and of itself to reverse this. Well, that's why we have section 1653 because because courts miss it all the time as the parties do. And that can be fixed even on appeal as long as there is actually jurisdiction. The Supreme Court is that it doesn't matter if the allegations were deficient so long as they could be amended at any time. And the question is, was there jurisdiction at the outset and nothing changed here? Correct. To suggest there was jurisdiction in the outset. Oh, I don't think there is evidence in the record to establish that there was jurisdiction in the outset. That's a fundamental failing of the district court in this case. So you said that the allegations were deficient. The district court found there was a facial attack. The allegations are deficient. Um, Nugent changed the allegations, had a affidavit saying our people are from Wisconsin and the district court found that that was found that there weren't, um, um, the other side's, your, the members of safe sake were not domiciled residents of Wisconsin and safe. They didn't put in any evidence attacking the facts saying, no, you're wrong. In fact, um, the, the president lives, you know, the, the, the members all live in Wisconsin. So what was wrong with the district court finding that there was, uh, there was diversity? Well, two things. Number one, the finding that none of safe SIGS members are domiciled in Wisconsin is insufficient as a matter of law to establish diversity. Why is that? Yeah. You got one state and if no one else is there, but a new gen, what as the U. S. Supreme court has held the, the existence of a stateless defendant will destroy diversity. A person can be stateless if they are, for example, domiciled outside of the United States. A person can be stateless if they are, for example, an itinerant grifter who does not maintain that. That's all theoretical. Let's get to this case. At least two of when the evidence is put in, at least two of these people, it's safe SIGS sues. They basically say all of the safe in state court that they're living in Los, that they are in Los Angeles. And when asked by the district court, okay, if I'm going to have a problem with this, why don't you tell me? Because under rule eight, it's peculiarly within your, not you, but within the company's knowledge. Safe SIG comes back and basically says, you have a lack of information and belief or whatever. And that's not sufficient. So I, you know, it seems to me that there's a lot of game playing here, not to get to the answer and to talk about that they might be living, you know, in Yemen or, um, in Guantanamo or in England. It doesn't really get to the question. That's what the judge asked you. And what did, what did your client respond? We, at the time, and we still do not know where those members are domiciled, as is in the record and as is set forth clearly. And in fact, as NewGen repeatedly relies on, at or around the time this lawsuit was filed, the company was in the midst of a great deal of turmoil and that Jonathan and shortly after this complaint was filed and they have not been in contact with the Safe SIG since. Lula Malone has never had an active role within the operation management or a business of Safe SIG. She is a true, you know, passive, silent investor. And it is not at all unusual in a limited liability company for the company itself to not know the precise domicile of each and every one of its members. Because in LLC, all it needs to know is who the manager is in order to operate. And it just needs to have an address to which it can send notice and correspondence. But an address does not establish domicile. And particularly with respect to the Deeks, we have been chasing them for now the better part of three and a half years, trying to get a hold of them and bring them to justice for what they did. And they continue to move around the country. So the idea that the Deeks may or may not have been domiciled in the state of California in October of 2012, when this lawsuit was filed, there is no evidence in the record that establishes that. The only evidence in that, in 2010, they signed an operating agreement declaring that two of their addresses were located in California. But if the district court, as I was reading it, is hearing all this basically a few years ago, and you're saying information of belief, nothing has come out of that. So this is where the fundamental policy against default judgments comes in. We have a situation here where the plaintiff has not proven, through admissible evidence, that diversity jurisdiction exists. Frankly, we have challenged their evidence of their own domicile. Their evidence of their own domicile is nothing more than a self-serving declaration. The cases, the Trevallio case and the Washington versus Avenza case that we've cited in our papers, talk about the fact that a self-serving declaration to try to establish diversity jurisdiction after a challenge has been raised is insufficient. What's amazing to me is that Nugen was able to come forward. But that might be true to a factual allegation, right? So, I mean, what Judge McKeon was asking is the district court understood it as a facial challenge to the deficiency in the allegations, and then the allegations having been made and no contrary factual allegations being made, the district court found good enough. And what's wrong with that, I guess, is the question. Once the allegations were made, we denied them. So we are in the amazing posture here today. Did you deny that there was, that, did you say, no, some of our members are in Wisconsin, so this is not... No diversity. There's no diversity. No, we weren't. Or one of our members is in Yemen, so no diversity. Did you make those sorts of factual allegations? I thought you just said there's not enough evidence here. We did not, we did not raise a specific, well, we presented evidence regarding some of our members, and with respect to the Deeks, we stated that we didn't have sufficient information to determine what their domicile was, and we therefore denied those allegations on that basis. We did the same thing with Nugen. We don't have sufficient evidence to determine whether Nugen is, in fact, a Wisconsin citizen. All we have is a self-serving declaration. Amazingly, Nugen was able to put forward SafeSigs operating agreement, not actually the current operating agreement, an outdated version of it, but a version of SafeSigs operating agreement, yet the record doesn't contain Nugen's own operating agreement. It is, it is remarkable to me that a, that a bald self-serving declaration without a single piece of documentary proof that, in fact, Nugen is the sole member of Nugen, or that Dustin Erickson is, in fact, domiciled in the state of Wisconsin, would be sufficient to prove diversity jurisdiction. Let's not forget that the plaintiff has the absolute burden to prove diversity jurisdiction. This court and the court below is required to presume that diversity jurisdiction does not exist until it, it has been proven. So we are standing here today in the remarkable position of having the currently operative pleading in the case is an amended complaint to which an answer has been filed, which denies the juristic, many of the jurisdictional allegations and denies the substantive allegations. And yet we have a judgment that has been entered on a superseded complaint, which no longer has any force in effect because an amended complaint was filed. So getting back to the initial question, 1653 only allows jurisdiction, jurisdictional allegations to be amended. When dealing with a default judgment context, that amendment to that complaint requires, by definition, that the default be opened up. 1653 can't trump the fundamental due process right that is set forth in Rule 15. So, so opposing counsel cites a case in the Second Circuit which allowed just that. Are you saying that that was indistinguishable because the defendant in that case never appeared? In that case, the defendant wasn't there. The defendant never sought to litigate the case. The defendant did not stand up before the court and say, there shouldn't be a default here. I'm ready. I'm here. I'm prepared to defend the case. So on that basis alone, the Jacobs case is inapplicable to this scenario because the competing interests of finality of judgments versus not allowing default judgments. And in the scenario that we're going back to the ITEL factors that you think the district court erred in its application of the ITEL factors. That's also a required consideration on a 60B motion, Your Honor. So, so that consideration of the fact that default judgments are disfavored and should only be entered in extraordinary circumstances, that factor is considered both in the ITEL analysis and in the ruling on the 60B motion. And that's fundamentally where the district court failed here. I also think that the Jacobs case was wrongly decided because the Jacobs case fundamentally deprived the defendant in that situation of the opportunity to answer the amended complaint. Mr. Sestero, let me interrupt. Yes, Judge. If the district court has a, quote, affirmative duty, I think that's what the case says, to determine jurisdiction, didn't the trial court, the district court here, attempt to fulfill its affirmative duty by asking the lawyers, what are the facts? And when one of the lawyers says, I don't have any information, what's the district court supposed to do to fulfill its, quote, affirmative duty? Well, again, in the context of a default judgment, the district court is required to give the defendant who is asking for the opportunity to litigate the issues in the case, and particularly to litigate these questions of jurisdiction, is required to give that defendant that opportunity. Well, didn't the district . . . You have that opportunity. That's where I'm having some trouble. What did you want to do? Take discovery, Your Honor. We should have had the opportunity to get Dustin Erickson, for example, into a deposition. We should have had the opportunity to take discovery on these allegations. But more fundamentally, we should have had the opportunity to litigate this case. What we're talking about here is a default judgment, a default judgment that was entered with no proof of a contract, a default judgment that was entered with no actual evidence of damages, no actual affirmative evidence that SafeSafe ever made any sales, with contrary evidence, in fact, presented by SafeSig that what they were claiming was the contract was not, in fact, the contract. So you have a judgment that was entered with all kinds of questions and doubts about whether it is even a valid cause of action and a valid judgment. And then to gloss over all of that and simply say, because SafeSig doesn't have enough information to disprove diversity jurisdiction, turns the entire legal system on its head. The plaintiff has the obligation to prove diversity jurisdiction. The defendant doesn't have the obligation to disprove it. You've now used your time. Are there any other questions at this stage? No. No. All right. Thank you. Good morning. May it please the court. My name is Harry Van Kamp and I represent NUGEN. I'm here today with my colleague from Dewitt, Ross, and Stevens, Deborah Miners. I think that the court has hit the nail on the head. I think the real issue that the court has asked us to address is whether or not a district judge sitting in diversity jurisdiction has the right to ask the parties questions about where they are, what their citizenship is. And his response to that is, in the shape of an LLC, you've got a managing director or an attorney. All you need for the other members is an address, and therefore they didn't know. But if they've been able to take discovery, then they could have told you the answer, but they never got a chance to take discovery. So I'd appreciate your answer to that. Well, that's a very funny proposition, because in this instance, the discovery that they would be talking about taking would be of their own clients, not of the plaintiff. I think they want to say that he was a citizen in his declaration. That it was a false declaration or something like that. I think that might be what they're saying. But I think they're saying, we don't even know where these people are, so we don't know where they live now, or maybe they live in Madison, Wisconsin. Right, and I think that... Unlikely, but... I'm sorry. I said it may be unlikely, but maybe they do. Right, and I think that, first of all, they never asked. There's nothing in the record even suggesting that the defendant, Safe-Cig, ever requested any discovery. They never did. And as far as the evidence regarding the plaintiff's domicile, I think that the declaration that was submitted is sufficient. Now, had Safe-Cig come back and had a factual dispute as opposed to a facial dispute, if they had done that, then I think there would have been a further duty to prove jurisdiction. They didn't do that. I think at some point they said it was weak, but they didn't contest it. Right, and so I think the real issue here is, can the judge, can a district judge, ask the parties for information about their domicile, which is what the judge in this case did, and what Safe-Cig is saying he didn't have the right to do. Safe-Cig is saying that that simple request was a change in the proof, in the burden of proof, and it is not. It is simply asking questions relative to jurisdiction. I think the case law, all through, suggests, and of course 28, 16, 53 clearly says, that they can do that. And so I think the the issue here that has to be determined is whether a judge can do that. Now, what happened when the judge did do that was a declaration filed by a gentleman, Mark Rosenberg, who claimed to be the chief executive, or no, the chairman of the board of Safe-Cig. Now, I think what happened was Safe-Cig attempted to find the only ignorant individual at Safe-Cig to file the declaration. And very often in this case, the truth about Safe-Cig is found not in what they say, but what they don't say. And this declaration is a personal declaration. It's not a declaration on behalf of Safe-Cig. And he basically, this is a fellow who became the chairman of the board in January, get the dates right, I think January 3rd of 2013, he made this declaration about not knowing where the dekes were and not having documents or information about them in April of the following year. So, 14 months, 13, 14 months later. But taking that at face value, was the district using counsel argues that the district court erred in going forward and saying that it did have diversity jurisdiction when Safe-Cig says, we don't know what the domicile of our members are. So, did the district court err in doing that? I think that's the question before us. Right. And if I could finish the timeline, a month after he, Mr. Rosenberg, became chairman of the board, Safe-Cig sued the dekes. So, they found the dekes, they served the dekes, they have litigation going on ongoing in the state of California against the dekes. When he says in this declaration that who the members are, in paragraph 3 of his declaration, he says, based on my review of Safe-Cig's operating agreement as amended, I am informed that Safe-Cig had 5 members as of October 23rd, 2012. This is a person that has been in litigation on behalf of Safe-Cig with the dekes for over a year. This is a person who is the chairman of the board for this organization and he says he has to go to the operating agreement to find out who the members are. This is not an organization that has 500 members. This is an organization that has five. And they're engaged in litigation. It's just, I think, accurate to say that there were plenty of other people at Safe-Cig who knew very well where and what the dekes were up to throughout this entire period of time. And all the declaration says, it doesn't say I made any inquiry, it doesn't say I talked to other people about this, it doesn't say anything that they did to find this information. It simply says I, Mark Rosenberg, don't know. Did you try to take any discovery on this point? Pardon me? Did you try to take any discovery on this point? I did not, Your Honor, because by the time this, if you look at the timeline, the appeal was filed in July of 2013. The first brief was filed, let me get these dates right, the notice of appeal was July 1st of 2013. The default judgment was entered and then after that a receiver was appointed and there were a number of proceedings because Safe-Cig was not cooperating with the receiver. So the receiver went to the court a number of times to get instructions from the judge and then ultimately it was, the first brief in this was filed nine months later or ten months later, which is the first time that this jurisdiction issue was raised. By that time, the district court didn't have jurisdiction and this court had jurisdiction and I'm afraid to say I don't know if there is any possibility to take discovery once this court has jurisdiction. And so no, we didn't take discovery because this court already had the initial appeal. Now I can tell you that there is, as I said, this California State ongoing and if discovery is possible in this court, in this setting, we have the attorney's name that represents the Deeks. We unfortunately, or for the better, don't take evidence or discovery up here. I understand that, but we're addressing a matter that is specifically addressed in to consider jurisdictional matters and facts at this level. That's why I ask the question and I don't know the answer to it, but believe me, I would be happy to do discovery on that issue because I believe I know the answer. And I think that the district court properly made the decision when, in fact, Safe-Cig did not deny the allegations. Mr. Van Kamp, was the district court attempting to fulfill its affirmative duty when it asked Safe-Cig for evidence of the Deeks and Ms. Malone's domicile? Was the district court reasonably inferring, since they didn't answer, that the answer would be adverse to the defendant? Is that what the district court did? Well, I think that probably the court did that, but I think the court also read the allegations in the amended complaint, which met the obligations to plead jurisdiction properly. But the answer to that by the defendant, Safe-Cig, was we don't have any information. So my question is, was it reasonable and not an abuse of discretion for the district court to find that the answer must be adverse to the defendant? I think it is. And I think that the Jacobs case and the reference to Wright and Miller also suggests that in that circumstance, an affiant can't simply deny information without making a reasonable inquiry about it. And I think that the fact that the declaration that came back from Mr. Rosenberg did not make any reasonable inquiry and didn't state that it made any reasonable inquiry. It just said, I don't know this information. And so I think with the plead, the issue of jurisdiction, and then when they said, well, we don't have any information to respond to that, I think that the judge properly made a finding that, in fact, there was absolutely not even a breath or a suggestion that any of the defendants, that is, any of the members of Safe-Cig had anything to do with the state of Wisconsin, much less with Omasa. At that point, is the case in the 60-B posture? Yes. Do you have any other questions for me about that? Appears not. Okay, thank you. Thank you. I'll give you a minute for rebuttal. I know we used up a lot of your time with questions. So if you could put one minute on the clock, please. Thank you very much, Your Honors. Let me address Judge Pratt's last question. I don't think it is proper for the district court to draw some adverse inference in this circumstance for two reasons. Number one, it's a default judgment context. And entering the default in the first place without having proper allegations of jurisdiction was without jurisdiction and should have been set aside. And then entering the default judgment without doing this should have been set aside. Secondly, creating that adverse inference is yet again putting the burden on the defendant. The whole process here that the trial court didn't have jurisdiction, as Mr. Van Kamp pointed out, because you all had jurisdiction. Trial court did all of this before you remanded. The fact that the trial court was putting the burden on SafeSig to disprove diversity jurisdiction was a fundamental error of law, which justifies reversing the judgment. That's my minute of rebuttal. Thank you. Thank you. He's the appellant, so I assume he will go first. Right. So at this point, we'll conclude the argument and the appeals related to the jurisdiction and 6dB and the ITEL factors. And now we'll hear appeal with respect to the New Gens cross appeal, which I believe is 13-56-225. And so this will be five minutes per side. Right. Very briefly, the cross appeal addresses an issue as to the nature of the lifetime commissions that SafeSig had agreed to pay to New Gen. And the only issue there is that the trial judge concluded that because the website that had been used, SafeSig, was no longer in existence, that commissions were no longer payable. But there were facts submitted by way of a declaration by Dustin Erickson that in fact what had happened was the sales that were made through the web pages that he established that originally went to SafeSig had been transferred by SafeSig to the Indian tribe, the Seminole tribe of Florida, and that those same sales were continuing to take place and that under the agreement he had a right to commissions from those. That's the long and the short of it. Thank you. Thank you. Thank you, Your Honors. The district court correctly refused this calculation of damages through the future, the 2018 or whatever it was, because it was that was submitted by New Gen in this case was purely speculative. Mr. Van Kamp's comment about the Seminole tribe or the evidence regarding the Seminole tribe misses the fundamental issue that was lacking in that evidence, which is there was no evidence that SafeSig was actually making those sales or getting that money. The only evidence that was presented was that the SafeSig website was redirected to a Seminole tribe website, but of course if the Seminole tribe made those sales, those would not be damages that SafeSig would owe those because those are sales made by the Seminole tribe. And there was absolutely no evidence that there were in fact any SafeSig customers that New Gen had So without that evidence, there's no basis on which to award damages going out into the future. And frankly, that defect exists in the entire damages calculation that the court relied on. There was no evidence by Mr. Erickson that in fact customers that New Gen had referred to SafeSig bought these were, or here's what we think SafeSig sales should have been, but they weren't entitled to commissions on all of SafeSig sales. They were only, even under their theory of the contract, only entitled to commissions on sales that were generated by New Gen that started with a link from a New Gen affiliate website. And there was no evidence as to the identity of customers or the, you know, tracking customers from New Gen's website through to SafeSig's website to prove how much of those estimated or projected SafeSig's revenue could possibly be attributable to New Gen. So that fundamental flaw... Did SafeSig present the sales records to show that? SafeSig presented a declaration which said, and a spreadsheet, which said that the records presented, or the numbers of gross SafeSig sales that were presented by New Gen were inaccurate. And they submitted a declaration, SafeSig submitted a declaration, first of all saying that the contract isn't what they say it is, and second of all that the sales aren't what they say they are. So that evidence was submitted by, in a declaration by Steve Else, filed in opposition to the second motion for entry of default judgment. Is that the chart I thought was like a year, 2010 to 2011? Is that right? It was, I think it went through 2012, I think, Your Honor. Yeah, I think it was 2011 and 2012 was the SafeSig declaration, the chart that was attached to that. And then, of course, the declaration established that SafeSig made no sales after December of 2012, and frankly has still not made any sales as of today. This is January 11th to January 2012, January 2011 to January 2012. So it's 2011, okay. Yeah. Okay, I have nothing further. Thank you. Thank you, Your Honor. You have a small amount of rebuttal if you need to take that. All right, thank you. Thank all counsel for the argument. New Gen versus SafeSig is submitted, and I must say you've probably invoked more rules of civil procedure than the average case, so thank you. The court is now adjourned. Thank you.
judges: McKeown, Ikuta, Pratt